# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ARLETHA STALLINGS,**<br>Plaintiff,<br>v.<br>**COMMISSIONER OF SOCIAL SECURITY,**<br>Defendant. | Civ. No. 2:13-cv-07758 (KM)<br><br>**OPINION** |

Arletha Stallings applied for Social Security disability benefits as well as supplemental social security income. She alleged that several health problems precluded from working, including asthma and problems with her shoulder, wrists, hands, and knees. An Administrative Law Judge, Dennis O'Leary, determined that Stallings did not meet the eligibility criteria for disability benefits. He found that her impairments were not severe enough to meet the statutory definition of disability. He also found that Stallings was capable of returning to her prior work, and that she was capable of performing a sufficient number of jobs in the national economy, either of which would disentitle her to benefits. Stallings has appealed that decision to this Court. I find that the Commissioner's decision is supported by substantial evidence. The decision will therefore be affirmed.

**Background**

Stallings alleges that she became disabled on November 15, 2003. (Disability Report,[1] 2) She was 40 years old at the time. (Decision, 10) Prior to that, she had worked as a hair stylist and a cashier. (Decision, 5) Stallings alleges that she has several physical impairments that make it very difficult for her to work.

First, Stallings alleges that she experiences pain and numbness in her wrists and hands, due partly to carpel tunnel syndrome. (Decision, 5) She also reports severe pain in her knees, requiring treatment with medication, icepacks, and heating pads. (Decision, 5) She also experiences severe shoulder pain, which she says makes it difficult or impossible to perform certain daily functions. (Decision, 5) Stallings also suffers from asthma attacks, which make it difficult for her to breathe. (Hearing, 51)

To decide whether Stallings met the requirements for disability, the ALJ followed the familiar five-step process prescribed in 20 C.F.R. §§ 404.1520(a)(4)

---

[1] I have reviewed the administrative record. Citations to particular items cited herein will be abbreviated as follows:

"Briski Report" – Physical Residual Functional Capacity Assessment, Dated March 11, 2011, Dkt. No. 6-13, 974-981.
"Damien Report" – MRI Reports from Natacio Damien, Medical Imaging Center of North Jersey, dated December 27, 2011, Dkt. No. 6-16, 1580-1582.
"Decision" – Decision, Social Security Office of Disability Adjudication and Review, dated August 9, 2012; Administrative Record, Dkt. No. 6-2, 13-32.
"Disability Report" – Disability Report – Adult, undated, from claimant; Dkt. No. 6-6, 136-144.
"Essex Report" – Essex Diagnostic Group, Report of Justin Fernando, dated February 24, 2011; Dkt. No. 6-13, 967-973.
"Hearing" – Transcript of Hearing before the Social Security Administration, July 25, 2012; Dkt. No. 6-2, 33-63.
"Hospital Records I" – UMDNJ-University Hospital Records, dated 11/30/2009 through 2/19/2010, Dkt. No. 6-10, 6-6-729.
"Hospital Records II" - UMDNJ-University Hospital Records, dated March 25, 2011 through November 30, 2011; Dkt. No. 6-16, 1429-1579.
"Hrg. Tr." – Transcript of Oral Hearing, held July 25, 2012, No. 6-2, 33-63.
"Pet." – Brief in Support of Plaintiff Arlene Stallings, Dkt. No. 9.
"Tan Report" – Medical records of Dr. Virak Tan, New Jersey Medical School, dated March 3, 2009 through November 24, 2009; Dkt. No. 6-10, 663-695.

2

and 416.920(a)(4). Briefly, that five step inquiry proceeds as follows. The claimant must first demonstrate that she is not currently engaged in "substantial gainful activity," *i.e.*, that she is not currently working. 20 C.F.R. § 404.1520(a)(4)(i). At Step 2, the claimant must demonstrate that she has a "severe medically determinable physical or mental impairment." 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the claimant must demonstrate that her impairment meets or is equal to the impairments listed in an Appendix to the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairment meets or equals one of the listed impairments, the claimant is presumed disabled, and the inquiry ends. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Meyler v. Comm'r of Soc. Sec.*, 238 F. App'x 884, 888-89 (3d Cir. 2007), as amended (Aug. 29, 2007). After step three, but before step four, the Commissioner determines the claimant's "residual functional capacity," meaning "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). The Commissioner then uses this determination at step 4 to decide whether the claimant can return to his prior occupation. 20 C.F.R. § 1520(a)(4)(iv). If the claimant cannot do so, at Step 5 the Commissioner determines whether the claimant can perform some other form of work available in the national economy. 20 C.F.R. § 1520(a)(4)(v).

In this case, the ALJ began by noting that Stallings had not engaged in substantial gainful activity since November 15, 2003. Although she had worked to a limited degree, she had not earned enough income to "rise to the level of substantial gainful activity." (Decision, 3) At Step 2, the ALJ found that Stallings had three severe impairments: asthma, a shoulder impingement, and a "mild median nerve entrapment of the wrists." At Step 3, however, the ALJ found that those impairments did not meet the severity of one of the impairments listed in 20 C.F.R. Part 303, Subpart P, Appendix 1. The ALJ then considered Stallings's Residual Functional Capacity ("RFC"). He determined that Stallings had the capacity to perform light work. (Decision, 4) Given this capacity, the ALJ found at Step 4 that Stallings could return to her former work as a cashier or hair stylist. (Decision, 5) In addition, at Step 5, the ALJ

3

found that there were a significant number of jobs in the national economy that Stallings could perform. (Decision, 11)

Stallings has appealed the ALJ's decision to this Court. She challenges the ALJ's determinations at Steps 2 and 3, then challenges the ALJ's determination of Stallings's residual functional capacity. Because Stallings questions the ALJ's RFC determination, she also challenges his conclusion that she is capable of performing gainful work at Steps 4 and 5.

**Discussion**

For each category of impairments, the ALJ's determinations are supported by substantial evidence.

**Wrist impairment**

The ALJ found that Stallings did have a legitimate impairment in her wrists (Step 2), but found that this impairment was not severe enough to qualify as one of the listed impairments in 20 CFR Part 404 Subpart P, Appendix 1 (Step 3). Further, the ALJ found that Stallings's wrist problems did not prevent her from performing light work (RFC Assessment), nor did it prevent her from returning to her prior work, or to other gainful employment (Steps 4 and 5). Those conclusions are supported by substantial evidence.

The relevant regulations specifically address wrist injuries. To rise to the requisite level of severity, the claimant must be unable to "perform fine and gross movements effectively." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.00(B)(2)(c). That means that the claimant must have experienced an "extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.00(B)(2)(c). Examples of an inability to effectively perform fine and gross movements include "the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle

4

papers or files, and the inability to place files in a file cabinet or at or above waist level." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.00(B)(2)(c). Conversely, an individual can effectively perform gross movements if she is "capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.00(B)(2)(c).

The medical evidence supports the ALJ's conclusion that Stallings's wrist injuries do not rise to the level of severity that Appendix 1 requires. Stallings is able to complete actions that indicate competence to perform fine and gross movements effectively. She reported difficulty in preparing meals, but she was able to pick up and write with a pencil, button a button, comb her hair, hold up a cup, and tie a shoe. (Hospital Records II, 16) Treatment records indicate that Stallings enjoys reasonable strength and dexterity in her wrists and hands. For example, in March 2009, an examining physician noted that Stallings had "excellent finger range of motion and strength." (Tan Report, 1) By April of 2009, Stallings reported that she was experiencing no pain in her wrists at all. (Tan Report, 3) In February of 2011, an evaluating physician explained that Stallings's "[h]and and finger dexterity are intact bilaterally, but the grip strength in the right hand is down to about 4/5 compared to the left." He noted that although her "pinch strength" was down slightly, she could "fully extend the fingers of the right hand. She could make a fist and oppose the fingers against the thumb." (Essex Report, 2) He explained that Stallings could "separate papers and button and unbutton buttons." (Essex Report, 2) Similarly, an X-Ray of Stallings's right hand revealed no fracture or dislocation, no abnormal soft tissue calcification, and revealed the hand to be intact. (Essex Report, 4) In March of 2011, the state agency physician found that Stallings had no manipulative limitations. (Briski Report, 4)

All of this substantial evidence provided sufficient support for the ALJ's determination that Stallings's wrist injuries were real, but not severe enough to meet the standards set by Appendix 1. Likewise, the evidence supports the ALJ's determination that Stallings could perform light work, could return to

her jobs as a cashier or hair stylist, and could perform other jobs within the national economy. No more is required to satisfy the substantial evidence standard of review.

**Knee impairment**

Stallings reported severe throbbing pain in her knees. (Decision, 5) She has treated the pain with icepacks, heating pads, and medication. (Decision, 5) She reported that she can walk only half a block without taking a break, and can stand for only 15 minutes without experiencing pain or discomfort. (Decision, 6)

The ALJ found that Stallings's knee condition did not qualify as a severe impairment at Step 2. Stallings replies that her knee impairment is "obviously" severe "based on the inherent assessment of function (limping, swelling, crepitus)." (Pet., 16) Stallings says this evidence is inconsistent with a conclusion that her "swollen, arthritic knee will allow her to stand and walk 6-8 hours per day, 40 hours per week without the slightest restriction as she limps along with her 'not severe' knee." (Pet., 17)

The ALJ's conclusion may not have been the only possible one. I find, however, that it was supported by substantial evidence.

To evaluate Stallings's knee injuries, the ALJ considered section 1.02 of 20 C.F.R. Part 404, Subpart P, Appendix 1. That section defines "major dysfunction of joints as having several elements:

  1) The impairment must affect a "major peripheral weight-bearing joint" such as a "hip, knee, or ankle."
  2) there must be a gross anatomical deformity such as contracture, bony or fibrous ankyloses, or instability;
  3) there must be chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joints;
  4) the record must contain findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joints, and

6

> 5) the impairment must result in either
>> A) an inability to ambulate effectively, or
>> B) an inability to perform fine and gross movements effectively.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.02. The regulations provide further guidance on what is meant by an inability to ambulate effectively. They define such an inability as "extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with an individual's ability to independently initiate, sustain, or complete activities." It means "insufficient lower extremity functioning...to permit independent ambulation without the use of hand-held assistive device(s) that limit the functioning of both upper extremities." Part 404, Subpart P, Appendix 1 § 1.00(B)(2)(b)(1). Examples of an inability to ambulate effectively include an

> inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.00(B)(2)(b)(2). Conversely, a person who is capable of ambulating effectively is one "capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.00(B)(2)(b)(2).

The evidence of record supports a conclusion that Stallings's knee injury is as severe as the regulations require it to be. To begin with, the ALJ found Stallings's description of the "intensity, persistence and limiting effects" of her symptoms were not fully credible. And he stated his reasons: her complaints, he wrote, were "inconsistent with the clinical signs described in the objective medical evidence." (Decision, 6) For example, Stallings reports that her knee pain started in 2008. (Hrg. Tr., 3) On November 30, 2009, though, an X-ray

7

was performed on Stallings's left knee. The X-ray revealed "no evidence of an effusion, joint space narrowing, osteophytic lipping or erosive disease. There is no ectopic calcification, fracture or dislocation. Bone density is normal." (Hospital Records II, 101) In August 2010, Stallings reported she had "twisted" her left knee two weeks earlier while "walking to a club in high heels." (Hospital Records I, 25) However, by the time of her appointment she denied feeling any pain in her knee. (Hospital Records I, 25) She reported that she only felt knee pain if she walked for a long period of time. (Hospital Records I, 25) By December of 2010, Stallings was reporting no pain in her knee. (Decision, 8, citing Exh. 28F) In November 2011, an MRI on the right knee revealed "no evidence of fracture, dislocation, joint space narrowing, osteophytic lipping or erosive disease." (Decision, 8, citing Exh. 28F) The MRI also noted "mild soft tissue inflammation...adjacent to the patellar tendon." (Hospital Records I, 9)

    These records do not establish the kind of severe infirmity contemplated by the regulations. In particular, they do not demonstrate an inability to ambulate.

    Stallings points to a December 2010 MRI which "did show medial tearing, bone marrow edema, subluxation of the patella, marked softening of the cartilage, peatellar maltracking and either a partially or fully torn patellofemoral ligament with marked increased signal intensity and thickening about the medial retinaculum consistent with tearing." (Pet., 20) However, the record also reflects that a short time later, in February 2011, Stallings underwent a medical evaluation at Essex Diagnostic Group. The examining physician diagnosed Stallings with "degenerative joint disease/osteoarthritis of both knees." (Essex Report, 2) However, the report seems to have found Stallings's knees to be in relatively good condition: A consultative examiner noted that Stallings walked on her heels and toes, enjoyed full strength in her legs, and showed "no evidence of any effusion, inflammation, or instability at any of the lower extremities." (Essex Report, 1-2) The doctor found Stallings's gait to be normal. (Essex Report, 2) And X-ray reports from both knees noted no structural problems with either knee. (Essex Report, 4) A short time later,

8

the state agency physician, Dr. Briski, checked a box indicating that Stallings could stand/walk for six hours with normal breaks. (Briski Report, 2)

Stallings also refers to a December 2011 MRI. That MRI, however, noted only moderate joint effusion. (Damien Report, 2) The doctor's overall impression was that Stallings had a "ligament sprain." (Damien Report, 2) A diagnosis of such a moderate condition does not serve to cast doubt on the ALJ's finding that Stallings's knee was not a severe impairment.

Stallings points to a limited amount of medical evidence in her favor. The ALJ, however, had far more substantial evidence to support his conclusion that Stallings did not suffer from a severe impairment of her knees at Step 2. The same evidence supports the ALJ's Step 4 and 5 determination that Stallings could perform "light work," including her prior jobs and other jobs within the national economy.

**Shoulder impingement**

For a shoulder impairment to equal the severity described in Appendix 1, the impairment must meet the same criteria recited above from section 1.02. That section defines "major dysfunction of joints" as having several elements:

1) The impairment must affect a "major peripheral weight-bearing joint" such as a "hip, knee, or ankle."
2) gross anatomical deformity;
3) chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joints;
4) findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankyloses of the affected joints."

Furthermore, the section states that the impairment must result in either

A) an inability to ambulate effectively, or
B) an inability to perform fine and gross movements effectively.

9

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.02. As explained above, Stallings has not demonstrated that she is unable to ambulate effectively. Nor has she demonstrated an inability to perform fine and gross movements effectively.

Stallings argues that a January 26, 2012 MRI revealed "degenerative disease and tearing of the AC joint," and as well as "prominent boney lesions, a boney infarct, AC joint effusion, a probable torn labrum, and tendonitis." (Pet., 22) That MRI, though, reported that Stallings had only mild tendinitis of one tendon, and that the remaining rotator cuff muscles and tendons were intact. (Damien Report, 3) Less than a year earlier, the examining physician found Stallings's range of motion was only mildly limited. (Essex Report, 3) The physician found this to be only a "mild problem." (Essex Report, 3) The medical evidence, therefore, does not demonstrate that Stallings's shoulder injury is sufficiently severe to meet the requirements of Appendix 1. The ALJ had an ample basis to conclude as he did.

**Asthma**

Stallings suffers from asthma. The ALJ found that while Stallings's asthma qualified as a Step 2 impairment, its severity was not extreme enough to meet the requirements of Appendix 1 at Step 3. That decision, too, was supported by substantial evidence.

The regulations address claims of disability due to asthma. They emphasize that the key issue is the frequency and intensity of asthma attacks. "[T]he frequency and intensity of episodes that occur despite prescribed treatment are often the major criteria for determining the level of impairment." 20 C.F.R. Part 404, Subpart P, App. 1, § 3.00(C). Furthermore, the regulations define an asthma "attack" as a rather extreme event.

> Attacks of asthma…[are] defined as prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic

10

> administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting...For asthma, the medical evidence should include spirometric results obtained between attacks that document the presence of baseline airflow obstruction.

20 C.F.R. Part 404, Subpart P, App. 1, § 3.00(C).

Stallings points to no medical evidence of such a severe condition. At the time of her hearing, Stallings stated that, pursuant to a doctor's prescription, she takes two puffs of an inhaler daily. (Hearing, 48) She also reported that she is trying to quit smoking, but still smokes three to four cigarettes per day. (Hearing, 47) Stallings does not, however, provide any medical evidence (or even describe any symptoms) indicating that her asthma rises to the level of severity described in the regulations.

The ALJ was thus on solid ground in deciding that Stallings's asthma condition did not equal the severity of the impairments described in Appendix 1. He was likewise supported by substantial evidence in concluding that Stallings could perform light work, that she could return to her work as a cashier or hair stylist, or perform other jobs. The state agency physician did conclude that Stallings should not be exposed to fumes, odors, gases, and the like. Stallings has provided no evidence, however, that would undermine the ALJ's determination that her prior work, or much work described at Step 5, would not involve exposure to such irritants.

The ALJ's findings with respect to Stallings's asthma condition will therefore be affirmed.

## **Conclusion**

The decision of the Social Security Administration will be affirmed. A separate order will issue.

Dated April 16, 2015
Newark, New Jersey

Kevin McNulty
United States District Judge

12